UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

MICHELLE HEINKEL, by and through
her parent and next friend DEBRA
HEINKEL, and NATE CORDRAY,

                    Plaintiffs,

vs.                                    Case No. 2:04-cv-184-FtM-33SPC

SCHOOL BOARD OF LEE COUNTY,
FLORIDA,

                    Defendant.
_____

### ORDER

     This matter comes before the Court on the Defendant's Motion
for Summary Judgment (Doc. #50), filed on January 20, 2005,  and
the Plaintiffs' Motion for Summary Judgment (Doc. #51), also filed
on January 20, 2005.  The Defendant and the Plaintiffs each filed
a memorandum in opposition to the other party's Motion for Summary
Judgment (Docs. #60 and #59, respectively).  On June 9, 2005, the
Court heard Oral Argument on the Motions for Summary Judgment.
Following Oral Argument and upon review of the Motions for Summary
Judgment and the responses, this Court finds that summary judgment
in favor of the Defendant should be granted.

I.    **STANDARD OF REVIEW**

Summary   judgment   is   appropriate   "if   the   pleadings,
depositions,  answers  to  interrogatories,  and  admissions  on  file,
together with the affidavits, if any, show that there is no genuine
issue as to any material fact and that the moving party is entitled
to judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual
dispute alone is not enough to defeat a properly pled motion for
summary judgment; only the existence of a genuine issue of material
fact will preclude the grant of summary judgment. <u>Anderson v.</u>
<u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).


II.   **BACKGROUND**

Plaintiff Michelle Heinkel, by and through her mother, Debra
Heinkel, and Plaintiff Nate Cordray allege that the School Board of
Lee  County,  Florida,  violated  their  rights  under  the  First  and
Fourteenth Amendments of the United States Constitution by refusing
to  allow  them  to  distribute  literature  at  Cypress  Lake  Middle
School,  where  Heinkel  was  a  student,  and  Riverdale  High  School,
where Cordray was a student. (Doc. #26.) Specifically, Heinkel and
Cordray claim that the Board violated their rights to freedom of
speech,  freedom  of  exercise  of  religion,  and  equal  protection  and
violated the Establishment Clause by denying Heinkel and Cordray
permission  to  distribute  literature  about  abortion  and  abortion
alternatives. (Doc. #51 at 2.)

2

Heinkel, Cordray, and the Board agree on the facts as set forth hereinafter.  Administrative Regulation 3.15 (the "Policy") sets forth the Lee County School District's policy on literature distribution. (Doc. #26, Ex. B.)  The Policy requires, inter alia, that individuals seeking to distribute handouts to students at a District school submit the handout to the superintendent for prior approval.  (Doc. #26, Ex. B.)

Freedom to Learn is a Florida non-profit  organization that sponsors an annual Day of Remembrance on which students distribute literature, wear t-shirts, and remain silent throughout the day "in honor of the 45 million unborn and the countless women who have been harmed by abortion." (Doc. #26 at ¶30-32; Doc. #42 at ¶31-32.) Pursuant to the Policy, on April 10, 2003, Freedom to Learn sought permission for students to distribute written materials on April 11, 2003 as part of the 2003 Day of Remembrance. (Doc. #26 at ¶45; Doc. #42 at ¶45.)

Later in the day on April 10, 2003, Dr. James Browder, superintendent of the District, denied Freedom to Learn's request for permission for students to distribute literature. (Doc. #26, Ex. C.)  Browder explained that he denied the request because he "determined that the documents would tend to create a substantial disruption in the school environment." (Doc. #26, Ex. C.)  Browder also explained that the materials Freedom to Learn submitted for approval did not contain disclaimer language required by the Policy

3

indicating "the school is neither endorsing nor sponsoring this event, product, or service nor endorsing the views of the sponsoring organization." (Doc. #26, Ex. B and C.) Consequently, neither Heinkel nor any other student distributed literature on the 2003 Day of Remembrance.

On January 29, 2004, Browder sent a letter to Freedom to Learn suggesting that if Freedom to Learn had any further requests to distribute literature, that the materials should be submitted to Browder for approval at least one week in advance of the distribution date and that such materials would be reviewed in accordance with the Policy. (Doc. #26, Ex. F.)

On March 26, 2004, Heinkel, by and through her mother, Debra Heinkel, filed a Verified Complaint for Declaratory Judgment, Preliminary and Permanent Injunctive Relief and Damages (Doc. #1) challenging the constitutionality of the Policy and the Board's decision not to allow her to distribute literature during the 2003 Day of Remembrance. Heinkel also filed a Motion for Preliminary Injunction (Doc. #2) requesting that the Court require the Board to permit Heinkel to distribute literature to students on April 16, 2004 during the 2004 Day of Remembrance.

A copy of the literature Heinkel wished to distribute during the 2004 Day of Remembrance (the "Literature") was attached as Exhibit A to the Verified Complaint. The Literature included filers entitled: "Abortion, can you handle the truth?," "National

4

Day of Remembrance, April 12, 2002," "National Day of Remembrance, April 14th, 2000," and "Friends for Life," each of which directly address the issue of abortion.  (Doc. #26, Exs. A and E.)   The Literature also included a flier entitled "A Special Prayer...For A Special Time," which does not directly address abortion, but touches on issues of teenage pregnancy and includes the web address of Freedom to Learn, whose webpage discusses abortion issues. (Doc. #26, Ex. D.)

On April 14, 2004, Heinkel faxed a letter to Browder requesting permission to distribute the Literature to her friends and classmates at Cypress Lake Middle School during non-instructional time on the 2004 Day of Remembrance.  (Doc. #56, Attach. 17; Doc. #26 at ¶57; Doc. #42 at ¶57.)  Also on April 14, 2004, the Court[1] denied the Motion for Preliminary Injunction (Doc. #25).  Heinkel then faxed a second letter to Browder on April 15, 2004 requesting permission to distribute materials during the 2004 Day of Remembrance. (Doc. #26, Ex. G; Doc. #26 at ¶61; Doc. #42 at ¶61.)  The second letter indicated that Heinkel's mother would be dropping off at Browder's office the materials Heinkel desired to distribute. (Doc. #26, Ex. G.) Heinkel also stated that while she wanted to distribute all of the Literature, she would be satisfied

---

[1]    The Motion for Preliminary Injunction (Doc. #2) and subsequent Motion for Temporary Restraining Order (Doc. #27) were denied by U.S. District Court Judge John E. Steele.  On September 21, 2004, this case was reassigned to the undersigned.  (Doc. #44.)

with distributing two fliers entitled "Friends for Life" and "A Special Prayer...For A Special Time." (Doc. #26, Exs. D, E and G.)

Also on the morning of April 15, 2004,[2] Plaintiffs' attorney, Joel Oster, sent a letter to Browder regarding distribution of written materials on the 2004 Day of Remembrance. (Doc. #26, Ex. H; Doc. #26 at ¶62; Doc. #42 at ¶62.) The letter reiterated Heinkel's request to distribute the fliers entitled "Friends for Life" and "A Special Prayer...For A Special Time." (Doc. #26, Ex. H.) The letter also stated, "We are also requesting on behalf of a high school student to distribute the same literature on the Day of Remembrance, April 16, 2004." (Doc. #26, Ex. H.)

On the afternoon of April 15, 2004, Browder denied Heinkel's request to distribute the Literature on the 2004 Day of Remembrance. (Doc. #26, Ex. I; Doc. #26 at ¶64; Doc. #42 at ¶64.) Upon reviewing the materials Heinkel wished to distribute at Cypress Lake Middle School, Browder "determined that the documents would tend to create a substantial disruption in the school environment." (Doc. #26, Ex. I.) Browder also explained that the Literature did not contain disclaimer language required by the Policy indicating "the school is neither endorsing nor sponsoring this event, product, or service nor endorsing the views of the sponsoring organization." (Doc. #26, Ex. B and I.)

───────────────

[2] While the letter is actually dated May 8, 2003, it was clarified in Browder's Deposition and confirmed in Oral Argument that the letter was actually sent on April 15, 2004.

6

On April 16, 2004, Heinkel filed a Verified Amended Complaint (Doc. #26) adding Nate Cordray as an additional Plaintiff. At the time, Cordray was a twelfth grade student at Riverdale High School. (Doc. #26 at ¶19.)   Also on April 16, 2004, Heinkel and Cordray filed a Motion for a Temporary Restraining Order (Doc. #27), which the Court denied (Doc. #30).   Consequently, Heinkel and Cordray did not distribute the Literature on the 2004 Day of Remembrance. (Doc. #51.)

Count I of the Verified Amended Complaint alleges that the Board violated Heinkel's and Cordray's First Amendment right to freedom of speech by denying them the ability to distribute the Literature during non-instructional time at school, including but not limited to before and after school, during breaks and during lunch time.   (Doc. #26 at ¶87.)   Count I further alleges that the Policy is vague and overbroad and, on its face and as applied, unconstitutionally prohibits students from distributing religious literature within the District.   (Doc. #26 at ¶¶95-96.)

Count II of the Verified Amended Complaint alleges that the Board violated Heinkel's and Cordray's First Amendment right to free exercise of religion.   Counts III and IV of the Verified Amended Complaint allege the Board has violated the Establishment Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment, respectively.

7

III. **ANALYSIS**

Both the Board and the Plaintiffs have filed Motions for Summary Judgment (Docs. #50 and #51) and agree there are no genuine issues of material fact precluding resolution of this matter on a summary judgment motion.  Upon review of the facts as set forth by both parties in their pleadings, there appears to be no genuine issue of material fact.  Therefore, this matter can be resolved on the parties' motions for summary judgment.

A.    **Standing of Nate Cordray**

As a preliminary matter, the Board argues that Cordray does not have standing to bring a claim because he is not enrolled in Lee County Schools, he never made a request to distribute the Literature, and no high school student has made a request to distribute the Literature.  (Doc. #50 at 9.) Cordray counters that "Plaintiffs' attorney requested on behalf of Nate Cordray to distribute literature in the high school." (Doc. #60 at 2.)

Under Article III of the Constitution, the Court may adjudicate only actual, ongoing controversies, which remain alive throughout the pendency of the proceeding.   To meet the minimum constitutional requirements of standing, Cordray must show that: (i) he has suffered an injury in fact, which is concrete and particularized; (ii) there is a causal connection between the injury and the conduct of which Cordray complains; and (iii) the injury is likely to be redressed by a favorable decision.

<u>Anderson-Free v. Steptoe</u>, 970 F. Supp. 945, 960 (M.D. Ala. 1997).

Standing is a "threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims." <u>Bochese v. Town of Ponce Inlet</u>, 405 F.3d 964, 974 (11th Cir. 2005)(citations omitted). The Court does not sit to decide arguments after events have put them to rest. See <u>Doremus v. Bd. of Educ. of Borough of Hawthorne</u>, 342 U.S. 429, 432-33 (1952)(holding student's First Amendment claim against a school district was moot because the student had graduated); <u>But</u> see <u>Honig v. Doe</u>, 484 U.S. 305, 318 (1988)(finding claim not moot where a 20 year old handicapped student was still within the Education of the Handicapped Act's protection and could return to school, even though student no longer resided in the district).

Despite evidence in the record that Plaintiffs' attorney Joel Oster, in his April 14, 2004 letter to Browder, stated, "We are also requesting on behalf of a high school student to distribute the same literature on the Day of Remembrance, April 16, 2004," (Doc. #26, Ex. H.), there is no evidence that Cordray himself sought permission to distribute the Literature. Additionally, according to the affidavit of Dr. Charles Bell (Doc. #56, Ex. #20), Director of Student Services for the District, Cordray withdrew from Riverdale High School on June 1, 2004 without receiving a diploma. (Doc. #56, Ex. 20.) While the fact that Cordray is no longer a student in the District does not in and of itself deprive

him of standing, see Honig, 484 U.S. at 318, when coupled with the fact that there is no evidence that Cordray actually made a request to distribute the Literature, Cordray does not have standing to bring this claim.   Therefore, Cordray is dismissed as a Plaintiff in this matter, and this Court will only address summary judgment arguments related to Heinkel's claims.

**B.   First Amendment Claims**

While students in public schools do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," Tinker v. Des Moines Indep. Cmty. Sch. Dist. , 393 U.S. 503, 506 (1969), the First Amendment rights of students in public schools "are not automatically coextensive with the rights of adults in other settings." Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 682 (1986). Because "the education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges," Hazelwood v. Kuhlmeier, 484 U.S. 260, 274 (1988), courts should not interfere with the administration of a school "[s]hort of a constitutional violation based on a school administrator's unsubstantiated infringement on a student's speech or other expressions." Scott v. Sch. Bd. of Alachua County, 324 F.3d 1246, 1247 (11th Cir. 2003).

For First Amendment purposes, there are three kinds of government property: (1) traditional public fora, (2) designated

10

public fora, and (3) nonpublic fora.  <u>Bannon v. Sch. Dist. of Palm Beach County</u>, 387 F.3d 1208 (11th Cir. 2004).  Traditional public fora are "places which by long tradition or by government fiat have been devoted to assembly and debate."  <u>Perry Educ. Ass'n v. Perry Local Educators' Ass'n</u>, 460 U.S. 37, 45 (1983).  "Public property which the state has opened for use by the public as a place for expressive activity" is characterized as a designated public forum. <u>Id.</u>

The government does not, however, create a designated public forum "by inaction or by permitting limited public discourse, but only by intentionally opening a nontraditional forum for public discourse."  <u>Cornelius v. NAACP Legal Def. and Educ. Fund, Inc.</u>, 473 U.S. 788, 802 (1985).  The courts look to the "policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum."  <u>Id.</u>  Absent clear evidence of contrary intent, the courts will not find that a public forum has been created.  <u>Id.</u> at 803.

There is no indication in the record that the Board opened the hallways of the Lee County schools to use by the general public for distributing written materials.  Indeed, the fact that the Board enacted the Policy is proof that the Board did not intend to open District schools to indiscriminate use by the general public. While there is evidence in the record that on some occasions local

11

athletic groups have been permitted to have materials posted in the main office of some schools so that interested students could stop by and pick up the materials, (Doc. #54, Ex. 1 at 88, lines 12-21), there is no evidence in the record that demonstrates that "permission has been granted as a matter of course to all who seek to distribute material." See Perry, 460 U.S. at 47.   For these reasons, the Court finds that for purposes of analyzing the Policy regarding distribution of written materials in District schools, the schools are nonpublic fora.

In nonpublic fora, the government may impose content-based restrictions which are reasonable in light of the purpose served by the forum and are viewpoint-neutral. Cornelius, 473 U.S. at 806; Searcy v. Harris, 888 F.2d 1314, 1318-19 (11th Cir. 1989).   A requirement that students submit materials to the school administration prior to distribution is therefore not per se unconstitutional. Shanley v. Northeast Indep. Sch. Dist., 462 F.2d 960, 969 (5th Cir. 1972).[3]

To determine whether the Policy is constitutional, the Court must examine whether the restrictions it imposes are reasonable in light of the purpose of the forum and whether the Policy is viewpoint-neutral.

---

[3] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted all cases decided by the Fifth Circuit Court of Appeals by the close of business on September 30, 1981 as binding precedent.

The Policy states, in pertinent part:
AR-3.15 <u>Advertising</u>

The following guidelines shall be followed with respect to any form of advertising on school grounds or through use of students, and political campaigning on grounds owned by the School District:

(1) Advertising on School Campus

(a) The Principal of each school is given authority to approve advertising on the school campus in the form of signs or other displays containing the company or organization name.  The Principal is also given authority to approve use of the school campus or a portion thereof as part of an advertisement.   Principal will give approval for such advertising only when such results in the school receiving funds from the advertiser.

(b) The Principal shall apply the following standards in deciding whether to approve advertising.

1. No advertisements may be obscene or promote products or services, which minors may not legally purchase or use.

2. No advertisements may contain libelous material.

3. No advertisement shall include political, religious or organizational symbols and shall be non-proselytizing.

4. No advertisement may be approved which would tend to create a substantial disruption in the school environment.

\* \* \*

(4)  Advertisement Through Distribution of Handouts

(a) Any entity requesting handouts be distributed to students at a District school shall submit the handout to the   Superintendent   or   his/her   designess   for consideration.

(b) The Superintendent or his/her designee shall apply the  standards  in  paragraph  1(a)  when  considering approval.

(c) Approved handouts will not be distributed to students unless the requester provides a sufficient number of copies for every student in the school.

(d)  All  handouts  shall  contain  the  following disclaimer in **bold** letters:

**The school is neither endorsing nor sponsoring this event, product or service nor endorsing the views of the sponsoring organization.**

Section 3.15(1)(b)(3) of the Policy, which sets forth the standard to be applied when determining whether particular advertising should be permitted, provides, "No advertisement shall include political, <u>religious</u> or organizational symbols and shall be non-proselytizing." (Doc. #26, Ex. B, emphasis added.) In other words, Section 3.15(1)(b)(3) of the Policy operates to exclude materials that deal with an otherwise permissible subject solely because the materials address the subject from a religious viewpoint. For this reason, Section 3.15(1)(b)(3) of the Policy is unconstitutional. <u>See</u> <u>Lamb's Chapel v. Ctr. Moriches Union Free Sch.</u>, 508 U.S. 384, 393-94 (1993)(the Supreme Court declared a school's action unconstitutional where the school denied a community group permission to show a film series about child rearing and family values solely because the film addressed the issues from a religious standpoint).

Therefore, while the Court declines to determine whether the Policy's restrictions are reasonable in light of the purpose of the forum, the Court notes that the Policy's prohibition of proselytizing materials and the lack of definite procedural safeguards, such as specific time limits for the superintendent's review of and response to requests to distribute materials, are indeed troublesome. <u>See</u> <u>Shanley</u>, 462 F.2d at 978 (finding school's literature distribution policy unconstitutional, in part due to lack of time period during which the principal or appellate board

14

must make their decisions); Burch v. Barker, 861 F.2d 1149 (9th Cir. 1988)(school's distribution policy was overbroad where the policy was of unlimited scope and duration); Quarterman v. Byrd, 453 F.2d 54 (4th Cir. 1971)(school policy was constitutionally defective where policy provided neither procedural safeguards nor guidelines for determining the right to publish or distribute); Rivera v. E. Ostero Sch. Dst. R-1, 721 F. Supp. 1189 (D. Colo. 1989)(finding school's ban on material that proselytizes a particular religious or political belief unlawful); But see Bannon, 387 F.3d at 1216 (refusing to adopt appellant's proposed reading of Supreme Court decisions that would require a school to allow students participating in a school-sponsored project to use the walls of a public school to proselytize); Hills v. Scottsdale Unified Sch. Dist., 329 F.3d 1044 (9th Cir. 2003)(finding that schools cannot refuse to distribute literature advertising a summer camp program with underlying religious content where it distributes similar literature for secular summer camps, but it can refuse to distribute literature that itself contains proselytizing language); Muller v. Jefferson Lighthouse Sch., 98 F.3d 1530 (7th Cir. 1996)(noting the Constitution does not dictate to school authorities a precise time limit for evaluating the propriety of a proposed student handout).

Although Section 3.15(1)(b)(3) of the Policy imposes an unconstitutional viewpoint restriction, the Board's denial of

Heinkel's request to distribute the Literature is not necessarily unconstitutional. In <u>Hazelwood</u>, the Supreme Court declined to decide whether regulations are required before school officials may censor publications not sponsored by the school that students seek to distribute on school grounds. 484 U.S. at 273 n.6. Therefore, even though Section 3.15(1)(b)(3) of the Policy is unconstitutional, "school officials can appropriately censure students' speech ... when they reasonably fear that certain speech is likely to 'appreciably disrupt the appropriate discipline in the school.'" <u>Scott</u>, 324 F.3d at 1248 (quoting <u>Denno v. Sch. Bd. of Volusia County</u>, 218 F.3d 1267, 1271 (11th Cir. 2000)).

Under the Supreme Court's ruling in <u>Tinker</u>, a school may justify its prohibition of a student's particular expression of opinion where the student's conduct would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school...," <u>Id.</u> at 509, or would "collid[e] with the rights of others." <u>Id.</u> at 511. The school need not wait for the disruption to occur, but instead may prohibit conduct when it reasonably concludes the student's expressive activities would materially and substantially interfere with the discipline in the school or would interfere with others' rights. <u>Butts v. Dallas Indep. Sch. Dist.</u>, 436 F.2d 728, 731 (5th Cir. 1971).

The record before the Court indicates that Browder denied

16

Heinkel's request to distribute the Literature at Cypress Hill Middle School because he reasonably concluded that Heinkel's distribution of the Literature would materially and substantially interfere with discipline of the school. First, in Browder's April 15, 2004 letter to Heinkel denying her request to distribute the Literature,[4] Browder stated that he was denying Heinkel's request because he "determined that the documents would tend to create a substantial disruption in the school environment." (Doc. #26, Ex. I.)

In his deposition testimony, Browder explained that his determination that the Literature would tend to create a substantial disruption was based on the fact that the materials were "about the issue of abortion or not." (Doc. #56, Ex. #1 at 80, line 9.) Susan Tutko, the lead health education teacher for the District, testified in her deposition that the District does not teach or discuss abortion. (Doc. #56, Ex. #18 at 14, lines 2-20; 22 at lines 6-7.) The Board also submitted an affidavit from Jeananne Folaros, principal of Cypress Lake Middle School, confirming that abortion is not a part of the middle school curriculum. (Doc. #56, Ex. #20 at 2.)

---

[4] The Court notes that, at one point, Heinkel attempted to change her request from distribution of all of the Literature to distribution of the two fliers entitled "Friends for Life" and "A Special Prayer... For A Special Time." (Doc. #26, Exs. D, E and G.) Browder's denial, however, addressed all the Literature, and as such, the Court will address the constitutionality of denying the Literature as a whole, rather than each individual flier.

17

Not only did the Board submit evidence that abortion is not part of the curriculum in the District, it also submitted evidence that discussions of abortion that would follow from distribution of materials addressing abortion would materially and substantially disrupt the school environment.  Tutko testified in her deposition that it was "an assumed policy that we don't discuss abortion in the school setting" because it is "a very emotional issue" that "polarizes a class" and becomes "disruptive to the educational setting."  (Doc. #56, Ex. #18 at 27, lines 21-25; at 28, lines 1-6.)  Indeed, the Supreme Court has recognized that "the abortion debate is among the most divisive and contentious issues that our Nation has faced in recent years." Rust v. Sullivan, 500 U.S. 173, 215 (1991)(Blackmun, J., Marshall, J., Stevens, J., dissenting).

Moreover, there is evidence in the record that if the Board had permitted Heinkel to distribute the Literature, such distribution would interfere with the rights of parents of the students at Cypress Lake Middle School to determine what information their children receive at school regarding reproductive health.   Section 1002.20(3)(d) of the Florida Statutes permits parents who make a written request to the principal to exempt their child from teaching of reproductive health or any disease, including HIV/AIDS.   According to Folaros' affidavit, following the filing of this lawsuit, she received "three complaints from parents of students at Cypress Lake Middle School who not only

18

oppose the distribution of materials or literature concerning abortion to their children while at school, but do not want the school or any other organization to be permitted to give information on abortion to their child." (Doc. #56, Ex. #20 at 2.)

Given the divisive nature of the subject of abortion and the uncontroverted testimony that it is not part of the curriculum taught at Cypress Hill Middle School, the record reflects "facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities." Tinker, 393 U.S. at 514. Furthermore, because Section 1002.20(3)(d) of the Florida Statutes permits parents to have their children exempted from the teaching of reproductive health, to permit students to distribute materials on the subject of abortion or teenage pregnancy would "collid[e] with the rights" of parents to monitor what information children receive at school regarding reproductive health. See Tinker, 393 U.S. at 511.

Finally, the Court notes that a school's prohibition of "expression of one particular opinion in regard to a controversial subject...is not constitutionally permissible." Tinker, 393 U.S. at 511. To permit distribution of pro-life materials but prohibit distribution of pro-choice materials would be unconstitutional. See id. Were the Board to permit Heinkel to distribute pro-life literature, it would necessarily open school hallways to distribution of pro-choice literature. Permitting pro-life and

19

pro-choice literature to be distributed by students in the school hallways would turn the school hallways into a battlefield. Such distribution "would hardly result in a theoretical suggestion of disruption...; [c]ommon sense dictates that the hallways would resemble a three-ring circus." Hembry v. Sch. Bd. of Colo. Springs Sch. Dist. No. 11, 760 F. Supp. 856, 861 (D. Colo. 1991).

Therefore, the Board's denial of Heinkel's request to distribute the Literature was not an unconstitutional violation of Heinkel's First Amendment rights, and summary judgment in favor of the Board shall be granted. Because summary judgment can be granted for the Board on the First Amendment issues, the Court declines to address arguments in the Board's Motion for Summary Judgment relating to the Free Exercise, Establishment and Equal Protection Clauses.

Accordingly, it is hereby

**ORDERED**, **ADJUDGED**, and **DECREED**:

1. Nate Cordray is **DISMISSED** as a Plaintiff in this matter for the reasons stated above. The Clerk of the Court is directed to terminate Nate Cordray as a Plaintiff.

2. Defendant's Motion for Summary Judgment and Incorporated Memorandum in Support (Doc. #50) is **GRANTED**.

3. Heinkel's Motion for Summary Judgment (Doc. #51) is **DENIED**.

4. The Clerk of the Court is directed to enter judgment

20

accordingly, close the file, and terminate all pending motions and previously scheduled deadlines.

DONE and ORDERED in Chambers in Ft. Myers, Florida, this 1st day of July, 2005.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies: All counsel of record

21